UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LISA N. BOSTICK,

        Plaintiff,
v.                        Case No. 8:16-cv-1400-T-33AAS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

        Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to Plaintiff Lisa N. Bostick's Motion for Jury Interview (Doc. # 157), which was filed on November 14, 2017. Defendant State Farm Mutual Automobile Insurance Company filed a Response in Opposition to the Motion (Doc. # 162) on November 28, 2017. The Court denies the Motion as explained below.

**I.**    **Factual and Procedural Background**

In mid-November, 2013, Bostick, a University of Tampa professor, was driving in Tampa, Florida when her car was rear-ended by non-party Blair Alsup. (Doc. # 2 at ¶ 4). Bostick claims to have suffered grave bodily injuries (including a traumatic brain injury), disability, mental anguish, and loss of capacity for the enjoyment of life as a result of the accident. (Id. at ¶ 6). At the time of the accident, Bostick was insured by State Farm and Alsup was

insured by GEICO. (Id. at ¶¶ 7-8). GEICO paid $100,000 to Bostick as "full and final settlement for the bodily injuries Alsup caused." (Id. at ¶¶ 8-9).

In Bostick's eyes, the $100,000 was insufficient compensation for her injuries and therefore she sued State Farm seeking underinsured/uninsured motorist benefits in state court. (Doc. # 2). State Farm removed the action to this Court on June 2, 2016, predicating jurisdiction on complete diversity of citizenship and underscoring in the Notice of Removal that "Plaintiff claims to have incurred, to date, $257,315.95 in total medical bills." (Doc. # 1 at 2). Bostick filed a Motion to Remand, which this Court denied. (Doc. # 20).

The Court conducted a two-week jury trial, which began on Monday, October 16, 2017. During the trial, the Court permitted the jurors to pose questions to the witnesses, and the jury was active and engaged during every phase of the proceedings. The jury began deliberating on the afternoon of Friday October 27, 2017. On that fateful Friday, the Court received several notes from various jurors. The first notes related to what seemed like reasonable and routine requests that trial courts customarily receive -- a request for an interpretation of a jury instruction regarding corporations

2

and a request for access to the "whiteboard" an expert used during the trial. (Doc. ## 144-52, 144-50). The Court then received several urgent messages from the jurors related to potential misconduct, harassment, as well as verbal and physical abuse. The Court apprised counsel of the tense situation and considered dismissing a juror, Jonathan Samelton, because the other jurors indicated that Mr. Samelton threatened them with physical violence.

However, in an abundance of fairness, the Court spoke with the concerned jurors outside of the presence of counsel and then sent the jurors home. The Court instructed the jury to return at 9:00 on the following Monday morning. Mr. Samelton explained that he had an appointment related to the payment of his electric bills on Monday morning, but that he would try to make it. The Court indicated to Mr. Samelton that he should try to make it to Court on Monday, but if he could not make it, she would allow the jury to continue their deliberations without him because only six jurors were needed in order to return a verdict.

## II. **The Events of Monday October 30, 2017**

On Monday, October 30, 2017, all of the jurors appeared for deliberations, including Mr. Samelton. From the very

3

beginning of the day, members of the jury complained that one particular juror, Mr. Samelton threatened to punch and harm them.  In addition, Mr. Samelton, gave the Court a letter explaining that he left the Courthouse in tears because he felt as though his vote did not matter. (Doc. # 144-57).  The Court decided to bring each juror into the Courtroom for questioning on the record.  The attorneys and the Court peppered the jurors with questions.  Ultimately, the Court dismissed Mr. Samelton for cause.  The Court did so based on the testimony below.

### A. The Juror Interviews

Jury foreperson William Moffitt testified that Mr. Samelton used profanity, threats of physical violence, racial slurs, and other actions that demonstrated disrespect for the other jurors. (Doc. # 159 at 1-6). Defense counsel asked Mr. Moffitt if Mr. Samelton's actions put the jurors "in fear physically for their safety" and Mr. Moffitt answered: "Yes." (Id. at 6).  Defense counsel also asked Mr. Moffitt whether Mr. Samelton "was physically aggressive toward you and others?" and Mr. Moffitt again answered: "Yes." (Id. at 7).

The next juror to be questioned was Thomas Barone. He indicated that Mr. Samelton "wanted something to start" and "wanted one of us to hit him" to initiate a physical

altercation. (<u>Id.</u> at 11). The third juror to be interviewed was Marlene Peterson. She stated that Mr. Samelton used profanity, was yelling, was "disrespectful to the other jurors verbally" and "called other members of the jury stupid just because of the disagreement." (<u>Id.</u> at 15-16). Ms. Peterson also testified that Mr. Samelton refused to follow the Court's jury instructions. (<u>Id.</u> at 19).

The fourth juror to be interviewed was Deborah Engert. When the Court asked her what she observed during deliberations, Ms. Engert testified:

> Some of them were threatened about getting hit. . . . One of the jurors said that he was going to hit someone; and they said, If that's what you need to do, go ahead. And he said, Well, I've been in jail before, so it doesn't matter. We were called – I hate to say it. We were called white asses and the B word and F-U. And it was bad. He didn't want to work with anybody. . . . I mean, we were in tears. The girls were in tears Friday when we left here.

(<u>Id.</u> at 20-21).

The next juror to be interviewed by counsel and the Court was Minh Le. Mr. Le described his interaction with Mr. Samelton as follows:

> last week there was one person. I mean, when we tried to discuss the case together as a group, he basically didn't want to do it. Basically he just said, This is what I want, and either you guys accept it or it's going to be a mistrial. Don't talk to me. He's just laying there. We tried to talk to him, to get him to discuss about this

> points. Also, this morning, too, we tried to put aside whatever happened last week. . . . He say, This is what I want, and nothing else. I don't want to listen.

(Id. at 24). Mr. Le further testified that Mr. Samelton "refused to follow the [jury] instructions . . . . He just want to do his way. That's basically all." (Id. at 25-26).

The sixth juror to be interviewed was Bruce MacFarlane, who testified:

> First day we were here, he wanted to be the foreman of the jury, the one person. From there on, it went into a matter of disrespect if you didn't do something he wanted. Like leaving early on certain days. . . . And we took all these notes, and we have all the results of what the trial had given us. So we were supposed to work on that, but that wasn't the issue. It was whether he was disrespected or not. So it came down to it was about him, not the case.

(Id. at 28). Defense counsel asked Mr. MacFarlane whether he felt "physically intimidated" by Mr. Samelton. Mr. MacFarlane responded: "Well, yes. He did use some rather bad words. He had both of those women crying in there. He's so big. He stood up in front of the other tall guy and it was face to face, chest to chest. It looked like there could have been some demonstrative action taken on his part." (Id. at 30). Defense counsel also asked: "Is it your impression that he is intentionally not wanting to follow the instructions of the Court and the law that were given because he's mad about not

6

being the foreman?" Mr. MacFarlane answered "Yes." (Id. at 31). Defense counsel asked whether Mr. Samelton's behaviors were aimed at "revenge" and Mr. MacFarlane explained "It has nothing to do with the case. It has to do with him." (Id.).

The last juror to be interviewed by counsel and the Court was Mr. Samelton. For his part, he said: "I was just concerned about, I guess, people trying to sway me a certain way." (Id. at 35). The Court asked Mr. Samelton "Do you think that you are able to continue deliberating with the other jurors or not?" and he responded: "I doubt it. No." (Id. at 38). The Court asked why, and Mr. Samelton stated: "I don't know how to put it. I put it as since there are seven of us and we all weigh a ton and there are six ton hammers pounding on the one-ton nail and it's going to go deeper and deeper into the hole until it gets to the point you can't pull it out, and so I feel that's where I'm at." (Id.). The Court gave both sides the opportunity to ask Mr. Samelton questions and both sides took advantage of the opportunity. The Court heard oral argument from the parties regarding whether Mr. Samelton should be released. Plaintiff's counsel objected, but the Court ultimately excused Mr. Samelton. (Id. at 46). After carefully listening to each juror, the Court ultimately determined that it was absolutely necessary to excuse Mr.

7

Samelton for the safety of the jurors. The Court determined that even the Court Security Offers's presence could not ensure the physical safety of each juror.

**B.     The Jury Reaches a Verdict**

Shortly after Mr. Samelton was excused, the jury reached a verdict in favor of State Farm on October 30, 2017. (Doc. # 140). At the conclusion of the trial, in conformity with Local Rule 5.01(d), the Court orally instructed the parties not to contact any juror. That Rule states:

> No attorney or party shall undertake, directly or indirectly, to interview any juror after trial in any civil or criminal case except as permitted by this Rule. If a party believes that grounds for legal challenge to a verdict exist, he may move for an order permitting an interview of a juror or jurors to determine whether the verdict is subject to the challenge. The motion shall be served within fourteen (14) days after rendition of the verdict unless good cause is shown for the failure to make the motion within that time. The motion shall state the name and address of each juror to be interviewed and the grounds for the challenge that the moving party believes may exist. The presiding judge may conduct such hearings, if any, as necessary, and shall enter an order denying the motion or permitting the interview. If the interview is permitted, the Court may prescribe the place, manner, conditions, and scope of the interview.

Id.

Judgment in favor of State Farm was entered on October 31, 2017. (Doc. # 145). On November 2, 2017, Bostick filed a

"Notice of Juror Contact and Request for Hearing," explaining: "On November 1, 2017, at approximately 2:37 PM and again at 2:47 PM, the dismissed juror left two voicemails at Plaintiff's Counsel's office requesting to speak." (Id. at 1). State Farm responded to the Notice (Doc. # 149), and the Court held a hearing on the matter on November 7, 2017. (Doc. # 148). The Court listened carefully to counsel's remarks and orally denied Bostick's request to further interview any juror. At the hearing, the Court explained that counsel for both sides already had the opportunity to interview the jurors and that it was neither necessary nor appropriate to have further communications with any juror. (Doc. # 153).

### III. **Another Request to Interview the Jury**

At this juncture, Bostick requests the opportunity to interview the entire jury "in that Plaintiff believes that grounds for a legal challenge to the verdict exists." (Doc. # 157 at 1). Bostick argues: "A jury interview under Local Rule 5.01(d) is warranted given the totality of the circumstances which include the juror five's dismissal over Plaintiff's objection, the presence of racial tension, the possibility that the contacting juror was a hold-out juror acting within his rights to agree or disagree, and other matters stemming from the multiple juror interviews conducted during the

9

deliberations." (Id. at 4).

The Court denies the Motion because the Court has already allowed counsel to interview each juror. When juror misconduct issues arose, the Court called each juror into the Courtroom and gave counsel for both sides the opportunity to question the jurors. The Court finds that it would be redundant to repeat the inquiry. The trial is over, and a verdict has been reached.

The decision whether to allow the parties to interview jurors is within the sound decision of the trial court. See United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991)(affirming denial of a motion to conduct juror interviews when a juror stated: "I voted for [the verdict] but it was not my verdict . . . I had no choice. It was 11 to 1."); United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir. 1990)(affirming trial court's denial of juror interview after defendant received an anonymous phone call from a "woman, possibly a juror," who stated "we were pressured into making our decision"). The court also denied juror interviews in United States v. Riley, 544 F.2d 237, 242 (5th Cir. 1976), explaining: "Historically, interrogatories of jurors have not been favored by federal courts except where there is a showing of illegal or prejudicial intrusion into the jury process. .

. . Courts simply will not denigrate jury trials by afterwards ransacking the jurors in search of some ground, not previously supported, for a new trial."

The Court refuses to conduct any further juror interviews. The Court already granted the extraordinary relief of allowing counsel to interview each and every juror. That was the time and the place to pose questions to the jurors. The Court refuses to intrude into the lives of the jurors, who so amply gave of their time and attention during a two-week trial. These jurors have every right to move forward with their lives without any further intrusion from the parties or the Court. The Motion is thus denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Plaintiff Lisa N. Bostick's Motion for Jury Interview (Doc. # 157) is **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>8th</u> day of March, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE