UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LISA N. BOSTICK,

      Plaintiff,

v.                 CASE No.: 8:16-cv-1400-T-33AAS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to
Plaintiff Lisa N. Bostick's Motion for New Trial (Doc. #
163), which was filed on November 28, 2017. Defendant State
Farm Mutual Automobile Insurance Company filed a response in
opposition on December 12, 2017. (Doc. # 165). After
careful review, this Court denies the Motion.

**I.**   **Background**

In mid-November of 2013, Bostick, a University of Tampa
accounting professor, was driving in Tampa, Florida when her
car was rear-ended by non-party Blair Alsup. (Doc. # 2 at ¶
4). Bostick claims to have suffered grave bodily injuries
(including a traumatic brain injury), disability, mental
anguish, and loss of capacity for the enjoyment of life as a
result of the accident. (Id. at ¶ 6). At the time of the
accident, Bostick was insured by State Farm and Alsup was

insured by GEICO. (Id. at ¶¶ 7-8). GEICO paid $100,000 to Bostick as "full and final settlement for the bodily injuries Alsup caused." (Id. at ¶¶ 8-9).

## A. Bostick Initiates a Lawsuit

In Bostick's eyes, the $100,000 was insufficient compensation for her injuries and therefore she sued State Farm seeking underinsured/uninsured motorist benefits in state court. (Doc. # 2). State Farm removed the action to this Court on June 2, 2016, predicating jurisdiction on complete diversity of citizenship and underscoring in the Notice of Removal that "Plaintiff claims to have incurred, to date, $257,315.95 in total medical bills." (Doc. # 1 at 2). Bostick filed a Motion to Remand, which this Court denied. (Doc. ## 11, 20).

## B. Deadlines and Delays

The Court held a Case Management Hearing and issued a Case Management and Scheduling Order on June 29, 2016. (Doc. ## 12, 13). At that time, the Court set Bostick's expert disclosure deadline as December 19, 2016, and set State Farm's expert disclosure deadline as January 23, 2017. (Doc. # 13 at 1). The Court established the discovery deadline as February 28, 2017, and the dispositive motions deadline as

March 20, 2017. (Id.). The pretrial conference was set as July 13, 2017, with the case on the August 2017 trial term. (Id.). In accordance with the Case Management and Scheduling Order, the parties selected Robert Lancaster, Esq., a certified mediator, and the Court appointed him to conduct the January 11, 2017 mediation. (Doc. ## 16, 17).

In light of Bostick's claimed injuries: "includ[ing] orthopedic injuries, neurological injuries, a brain injury, and psychological injuries," State Farm planned to conduct a Rule 35, Fed. R. Civ. P., compulsory medical examination on September 13, 2016. (Doc. ## 22-1, 28 at 1). Bostick sought to avoid or otherwise delay the examination. The Court entered numerous Orders regarding the examination (Doc. ## 23, 27, 30, 32, 37). And, after months of delay that impacted other proceedings, including the mediation, the compulsory medical examinations finally occurred on January 19, 2017 (orthopedic exam) and January 26, 2017 (neuro-psychological exam). (Doc. # 37 at 3-4).

Because of the delays associated with scheduling the examinations, and receiving the results of the examinations, the Court extended all deadlines and authorized the parties to conduct the mediation in March of 2017. (Doc. ## 32, 35).

The Court issued an Amended Case Management and Scheduling Order establishing April 20, 2017, as the discovery deadline, May 4, 2017, as the dispositive motions deadline, and setting the pretrial conference for August 17, 2017, with the trial set for September of 2017. (Doc. # 41).

The mediator reported that the parties reached an impasse on March 14, 2017 (Doc. # 40), and thereafter, the parties flooded the docket with motions in limine, motions to strike, and motions for protective orders. See (Doc. ## 45, 51, 53, 54, 57, 58, 59, 60, 89, 100, 116). The parties also filed motions to strike during the course of the trial. See (Doc. ## 124, 126, 127).

Among other motions to strike, Bostick sought an Order striking State Farm's biomechanical engineer, Ronald Fijalkowski, Ph.D. (Doc. # 60), which the Court denied after conducting a detailed Daubert analysis. (Doc. # 76). Likewise, State Farm filed a Motion requesting that the Court exclude Bostick's treating physicians from testifying at trial, or in the alternative, to limit their testimony. (Doc. # 53). In that motion to strike, State Farm explained that Bostick disclosed five retained expert witnesses, but did not provide proper disclosures for her treating

physicians. The Court granted the motion in part and denied the motion in part on July 5, 2017. (Doc. # 74). Notably, Bostick disclosed 19 treating physicians to State Farm on April 20, 2017, but State Farm did not have the opportunity to conduct discovery with respect to the 19 treating physicians because the discovery deadline was April 20, 2017. When Bostick disclosed the 19 treating physicians, she did not provide information on the subject matter of their testimony nor a summary of the facts and opinions on which the witnesses were expected to testify. <u>See</u> Fed. R. Civ. P. 26(a)(2)(C). The Court declined to strike the treating physicians, but did limit their testimony to the observations that they made during the course of Bostick's treatment. (Doc. # 74).

### C. <u>The Trial Takes Place</u>

The Court conducted an 11-day jury trial that began on October 16, 2017. (Doc. # 119). The trial was an interesting one and the seated jurors posed many questions to the witnesses, demonstrating that they were engaged and mindful of their civic duties. Notably, the jurors' questions were so poignant and insightful that they

sometimes surpassed the questions counsel posed to the witnesses.

Over the course of six days, Bostick presented her case through the following witnesses: Dr. Thomas Boland, Dr. Robert Beekman, Dr. Michael Williams, Dr. Kimberly Tobon (via video), Dr. Randall Benson, Dr. Joseph Chiaramonte, Dr. Gregory Flynn, Kathryn Bostick, Blair Alsup, Stephen Koontz, James Bostick, Dr. Christopher Leber, Dr. Daniel Verreault, Dr. Cheri Etling, Lisa Bostick, Patricia Daphne Ullman, and Robert Johnson. State Farm presented its case for three days through Dr. Nelson Castellano, Dr. Rodney Vanderploeg, Dr. Micahel Foley (via video), and Dr. Fijalkowski. Bostick offered video deposition testimony in rebuttal from herself, Dr. Stephen Knezevich, and Dr. Vanderploeg. The presentation of the evidence concluded on October 27, 2017, and the Court held charge conferences on October 26, and 27, 2017.

The jury began deliberating on the afternoon of Friday October 27, 2017. During that time, the Court received several notes from various jurors. The first notes related to routine matters, for example, the jurors requested access to a "whiteboard" that an expert used during his trial

testimony. And, the jurors asked for clarification of a pattern jury instruction. (Doc. ## 144-52, 144-50). The Court then received several urgent messages from the jurors related to potential misconduct, harassment, as well as verbal and physical abuse. The Court apprised counsel of the tense situation and considered dismissing a juror, Jonathan Samelton, because the other jurors indicated that Mr. Samelton threatened them with physical violence.

However, in an abundance of fairness, the Court spoke with the concerned jurors outside of the presence of counsel and then sent the jurors home. It was very late in the evening, and the Court hoped that a cooling-off period would be sufficient to diffuse the emotional situation. That Friday evening, the Court instructed the jury to return at 9:00 on the following Monday morning. Mr. Samelton explained that he had an appointment related to the payment of his electric bills on Monday morning, but that he would try to make it on time. The Court indicated to Mr. Samelton that he should try to make it to Court on Monday, but if he could not make it, the Court would allow the jury to continue their deliberations without him because only six jurors were needed in order to return a verdict.

On Monday, October 30, 2017, all of the jurors appeared for deliberations, including Mr. Samelton. From the very beginning of the day, members of the jury complained that Mr. Samelton had threatened to punch and harm them. In addition, Mr. Samelton gave the Court a letter explaining that he left the Courthouse in tears on Friday because he felt as though his vote did not matter. (Doc. # 144-57). The Court decided to bring each juror into the Courtroom individually for questioning on the record. The attorneys and the Court questioned each juror. Ultimately, the Court dismissed Mr. Samelton for cause. The Court did so based on the testimony below.

### D. The Juror Interviews

Jury foreperson William Moffitt testified that Mr. Samelton used profanity, threats of physical violence, racial slurs, and other actions that demonstrated disrespect for the other jurors and for the deliberative process. (Doc. # 159 at 1-6). State Farm's counsel asked Mr. Moffitt if Mr. Samelton's actions put the jurors "in fear physically for their safety" and Mr. Moffitt answered: "Yes." (Id. at 6). Counsel for State Farm also asked Mr. Moffitt whether

Mr. Samelton "was physically aggressive toward you and others?" and Mr. Moffitt answered: "Yes." (Id. at 7).

The next juror to be questioned was Thomas Barone. He indicated that Mr. Samelton "wanted something to start" and "wanted one of us to hit him" to initiate a physical altercation. (Id. at 11). The third juror to be interviewed was Marlene Peterson. She stated that Mr. Samelton used profanity, was yelling, was "disrespectful to the other jurors verbally" and "called other members of the jury stupid just because of the disagreement." (Id. at 15-16). Ms. Peterson also testified that Mr. Samelton refused to follow the Court's jury instructions. (Id. at 19).

The fourth juror to be interviewed was Deborah Engert. When the Court asked her what she observed during deliberations, Ms. Engert testified:

> Some of them were threatened about getting hit. .
> . . One of the jurors said that he was going to
> hit someone; and they said, If that's what you
> need to do, go ahead.  And he said, Well, I've
> been in jail before, so it doesn't matter.  We
> were called – I hate to say it.  We were called
> white asses and the B word and F-U.  And it was
> bad.  He didn't want to work with anybody. . . . I
> mean, we were in tears.  The girls were in tears
> Friday when we left here.

(Id. at 20-21).

The next juror to be interviewed by counsel and the Court was Minh Le. Mr. Le described his interaction with Mr. Samelton as follows:

> [L]ast week there was one person. I mean, when we tried to discuss the case together as a group, he basically didn't want to do it. Basically he just said, This is what I want, and either you guys accept it or it's going to be a mistrial. Don't talk to me. He's just laying there. We tried to talk to him, to get him to discuss about this points. Also, this morning, too, we tried to put aside whatever happened last week. . . . He say, This is what I want, and nothing else. I don't want to listen.

(Id. at 24). Mr. Le further testified that Mr. Samelton "refused to follow the [jury] instructions . . . . He just want to do his way. That's basically all." (Id. at 25-26).

The sixth juror to be interviewed was Bruce MacFarlane, who testified:

> First day we were here, he wanted to be the foreman of the jury, the one person. From there on, it went into a matter of disrespect if you didn't do something he wanted. Like leaving early on certain days. . . . And we took all these notes, and we have all the results of what the trial had given us. So we were supposed to work on that, but that wasn't the issue. It was whether he was disrespected or not. So it came down to it was about him, not the case.

(Id. at 28). State Farm's counsel asked Mr. MacFarlane whether he felt "physically intimidated" by Mr. Samelton. Mr. MacFarlane responded: "Well, yes. He did use some

10

rather bad words. He had both of those women crying in there. He's so big. He stood up in front of the other tall guy and it was face to face, chest to chest. It looked like there could have been some demonstrative action taken on his part." (Id. at 30). State Farm's counsel also asked: "Is it your impression that he is intentionally not wanting to follow the instructions of the Court and the law that were given because he's mad about not being the foreman?" Mr. MacFarlane answered "Yes." (Id. at 31). Defense counsel asked whether Mr. Samelton's behaviors were aimed at "revenge" and Mr. MacFarlane explained "It has nothing to do with the case. It has to do with him." (Id.).

The last juror to be interviewed by counsel and the Court was Mr. Samelton. For his part, he said: "I was just concerned about, I guess, people trying to sway me a certain way." (Id. at 35). The Court asked Mr. Samelton "Do you think that you are able to continue deliberating with the other jurors or not?" and he responded: "I doubt it. No." (Id. at 38). The Court asked why, and Mr. Samelton stated: "I don't know how to put it. I put it as since there are seven of us and we all weigh a ton and there are six ton hammers pounding on the one-ton nail and it's going to go

deeper and deeper into the hole until it gets to the point you can't pull it out, and so I feel that's where I'm at." (Id.). The Court gave both sides the opportunity to ask Mr. Samelton questions and both sides took advantage of the opportunity.

The Court heard oral argument from the parties regarding whether Mr. Samelton should be released. Bostick's counsel objected, but the Court ultimately excused Mr. Samelton. (Id. at 46). After carefully listening to each juror, the Court determined that it was absolutely necessary to excuse Mr. Samelton for the safety of the jurors.

**E.   <u>The Verdict</u>**

Shortly after Mr. Samelton was dismissed, the jury reached a verdict in favor of State Farm on October 30, 2017. (Doc. # 140). Specifically, the jury answered "No" to question 1 on the verdict form, finding that there was no "negligence on the part of non-party, Blair Alsup [that was] a legal cause of loss, injury, or damages to Plaintiff, Dr. Bostick." (Id.).

At the conclusion of the trial, in conformity with Local Rule 5.01(d), the Court orally instructed the parties

not to contact any juror.  Judgment in favor of State Farm was entered on October 31, 2017. (Doc. # 145).  On November 2, 2017, Bostick filed a "Notice of Juror Contact and Request for Hearing," explaining: "On November 1, 2017, at approximately 2:37 PM and again at 2:47 PM, the dismissed juror left two voicemails at Plaintiff's Counsel's office requesting to speak." (<u>Id.</u> at 1).  State Farm responded to the Notice (Doc. # 149), and the Court held a hearing on the matter on November 7, 2017. (Doc. # 148).  The Court denied Bostick's request to further interview any juror.  At the hearing, the Court explained that counsel for both sides already had the opportunity to interview the jurors and that it was neither necessary nor appropriate to have further communications with any juror. (Doc. # 153).  Thereafter, Bostick filed a Motion requesting the opportunity to interview the entire jury once more. (Doc. # 157 at 1).  The Court denied the Motion. (Doc. # 174).

At this juncture, Bostick seeks a new trial arguing that (1) "the jury should have been discharged and a mistrial declared when it became apparent that a physical altercation had occurred or was imminent," (2) the verdict was against the clear weight of the evidence, (3) a complete

set of exhibits did not go back to the jury room, (4) the jury did not understand the jury instructions and verdict form, (5) the court improperly limited the testimony of Bostick's treating physicians, (6) State Farm made improper arguments, (7) Dr. Fijalkowski offered improper causation testimony, and (8) the cumulative effect of the Court's evidentiary rulings prevented a fair trial. The Court will address each argument in turn.

## II.  **Rule 59 Analysis**

Rule 59 of the Federal Rules of Civil Procedure governs motions for a new trial and generally provides that a new trial may be granted "on all or some of the issues--and to any party  .  .  .  after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Id.

The Supreme Court noted that a party may seek a new trial on grounds that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co. v. Duncan, 311 U.S. 243,

251 (1940). The Eleventh Circuit has emphasized that "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." <u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1186 (11th Cir. 2001). And, the Court should only grant a new trial if the verdict "will result in a miscarriage of justice." <u>Id.</u> "[W]hen the trial involves simple issues, highly disputed facts, and there is an absence of 'pernicious occurrences,' trial courts should be considerably less inclined to disturb a jury verdict." <u>Williams v. Valdosta</u>, 689 F.2d 964, 974 (11th Cir. 1982).

### A.  <u>Juror Issues</u>

Bostick seeks a new trial based on the Court's removal of Mr. Samelton as a juror and also indicates that a mistrial should have been declared based on "unorthodox jury deliberations." (Doc. # 163 at 3). Bostick contends that Mr. Samelton was a "holdout juror" and it was improper for the Court to remove him from the jury: "There is no nonprejudicial way to determine whether the holdout is acting in self-defense or is an aggressor. In essence, what occurred was a trial within a trial itself, resulting in the

15

discharge of an apparent dissenter.  This dynamic defies the reliability and trustworthiness the jury system demands of verdicts."  (<u>Id.</u> at 4).

Federal Rule of Civil Procedure 47(c) specifies that the Court may excuse a juror during trial or deliberation for good cause.  The Court found good cause to excuse Mr. Samelton after individually questioning each juror and permitting counsel to do the same.  The juror interviews demonstrated that Mr. Samelton was refusing to follow the Court's jury instructions, infecting the jury deliberations with racial slurs, calling female jurors "bitches" and other pejorative terms, using physical violence or threats against other jurors, and engaging in other gravely inappropriate conduct.  To be sure, Mr. Samelton generally denied that he engaged in misconduct, but the Court, after considering all of the juror testimony, determined that it was absolutely necessary to excuse Mr. Samelton to prevent him from physically harming the other jurors.

The Court acknowledges Bostick's argument that, instead of excusing Mr. Samelton, the Court should have given an <u>Allen</u> charge.  The Court has given <u>Allen</u> charges in several trials, and the Court realizes the value of such a charge.

However, the Court found that removal of Mr. Samelton was required to ensure the physical safety of the jurors. The Court did not remove Mr. Samelton because he was a "holdout juror." If the Court believed that Mr. Samelton could continue deliberating without physically harming and intimidating the other jurors, the Court would have given the <u>Allen</u> charge and allowed the deliberations to continue. And, if a hung jury were the result, the Court would have accepted that result and declared a mistrial. However, there is a vast difference between a holdout juror and a juror who engages in misconduct such that the other jurors are in fear for their physical safety. All in all, the Court was faced with a very difficult situation, and only excused Mr. Samelton as a last resort because the Court believed that he was going to physically harm other jurors. After Mr. Samelton was excused, the jurors reached a unanimous verdict in favor of State Farm. Bostick has not demonstrated that "juror issues" warrant a new trial.

**B.** **The Weight of the Evidence**

Bostick argues that "[i]n finding completely for the Defendant and awarding zero damages to Plaintiff, the jury disregarded the medical testimony of Dr. E. Michael

Williams, Dr. Kimberly Tobon, Dr. Gregory T. Flynn, Dr. Thomas J. Boland, Dr. Joseph Chiaramonte, Dr. Randall R. Benson, Dr. Christopher N. Leber, and Dr. Steven Knezevich, resulting in a miscarriage of justice." (Doc. # 163 at 4).

In considering Bostick's contentions regarding the weight of the evidence presented at trial, this Court is mindful of the Eleventh Circuit's warning that "[t]he trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow" and is limited to "protect[ing] against manifest injustice in the jury's verdict." Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984).

The Eleventh Circuit explained in Lipphardt:

> A judge should grant a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. . . . . Because it is critical that a judge does not merely substitute h[er] judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great--not merely the greater--weight of the evidence.

267 F.3d at 1186 (internal citations omitted).

In deciding whether to grant a new trial, the Court is also guided by the holding in <u>Tennant v. Peoria & Pekin Union Ry.</u>, 321 U.S. 29, 35 (1944) that:

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

<u>Id.</u>

Stated another way, "[t]he district court should not substitute h[er] own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." <u>Walls v. Button Gwinnett Bancorp.</u>, 1 F.3d 1198, 1201 (11th Cir. 1993). However, an order reweighing the evidence is precisely what Bostick requests by her present Motion.

Both sides secured medical testimony and that testimony was in conflict. The jury was entitled to accept or reject any portion of that evidence and was entitled to follow or discredit any expert's opinion. Just as Bostick has pointed

to evidence that she believes would support a verdict in her favor, State Farm has highlighted evidence favorable to it and tending to show that Bostick did not suffer injuries as a result of the car accident.

For example, State Farm points out that the jury heard testimony from Alsup about Bostick's non-injured state at the scene of the car accident; from Bostick herself that she is currently a tenured accounting professor and is teaching the courses that she was hired to teach; from Dr. Fijalkowski that there was not sufficient force created in the accident to create the injury that Bostick claims to have sustained; from Dr. Castellano that Bostick did not sustain any temporomandibular joint injuries as a result of the accident; from Dr. Foley that there was no radiographic evidence of injury to Bostick; and from Dr. Vanderploeg that Bostick had no issues indicative of a traumatic brain injury.

As explained in <u>Mims v. United States</u>, 375 F.2d 135, 140 (5th Cir. 1967), "one of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the question of *credibility* and *weight* of expert opinion testimony are for the trier of facts, and

that such testimony is ordinarily not conclusive even where it is uncontradicted." (emphasis in original). The Court's instructions to the jury reflect that the jurors were not required to accept the opinion of any witness, including expert witnesses: "When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter. **But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion."** (Doc. # 141 at 6)(emphasis added). Thus, the jury was not required to credit the testimony of Bostick's experts, and the jury's decision not to credit such testimony is not a proper basis for granting a new trial. In addition, the Court finds that State Farm presented substantial evidence demonstrating that Bostick's injuries, if any, were not caused by the subject car accident, evidence that the jury was entitled to credit. The Motion for a New Trial is denied to the extent it is based on the weight of the evidence.

The Court also rejects Bostick's related argument that she should have at least been awarded her medical expenses.

Bostick at no time moved for a judgment as a matter of law that she was entitled to medical expenses.  And, Bostick did not request a jury instruction on nominal damages, or another specific charge regarding medical expenses. Furthermore, Bostick waived any argument of an inconsistent verdict because she failed to timely object to the verdict. This was an "all or nothing" verdict form.  The jury did exactly what it was instructed to do.  The first question asked if "the negligence on the part of non-party, Blair Alsup, was a legal cause of loss, injury, or damage to Plaintiff, Dr. Bostick?"  The verdict form then instructed the jury that if their answer to that question is "no," then their verdict was for State Farm and that they should not answer any other questions.  Bostick agreed to this verdict form and waived any challenge to the verdict form.

### C.  Incomplete Exhibits

Bostick also contends that a new trial is warranted because "it appears as though a complete set of exhibits did not go back before the jury for the panel to consider in reaching a verdict." (Doc. # 163 at 5).  Specifically, Bostick claims that Dr. Chiaramonte's medical records did not make it back to the jury room.  The Court agrees with

State Farm that "it was Plaintiff's obligation to ensure that all of her exhibits were moved and accepted into evidence." (Doc. # 165 at 8). The Court certainly gave Bostick the opportunity to review all of the exhibits and evidence before it was given to the jury and to ensure that it was complete, accurate, and in accord with the Court's evidentiary rulings. Bostick's counsel did in fact review the exhibits and there was no indication that any files were incomplete. The Court denies the Motion for a New Trial based on the supposed incomplete nature of the jury's access to Dr. Chiaramonte's records.

D. **Jury Confusion over Verdict Form and Instructions**

Bostick requests a new trial based on the argument that the jury was confused by the verdict form and the jury instructions. The Court roundly rejects her arguments about the verdict form. The verdict form was simple, straight forward, and there is no indication that the jury struggled with the form. And, importantly, the verdict form read and provided to the jury was jointly submitted and approved by the parties, and Bostick did not object to the verdict form at any point before the trial, during the multiple charge

23

conferences, or before the verdict form was sent to the jury.

As to the jury instructions, the Eleventh Circuit has noted:

> So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions. On appeal, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled. Under this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed. We must reverse an erroneous instruction, however, if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.

Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543 (11th Cir. 1996)(internal citations and quotations omitted).

Here, Bostick argues that there was confusion over "negligence" and claims that the confusion warrants a trial because "negligence was not at issue at trial." (Doc. # 163 at 6). Jury instruction six -- the "Summary of Claims" states: "Dr. Bostick claims that Blair Alsup was negligent in the operation of her motor vehicle, which caused her harm. State Farm agrees Blair Alsup was at fault for the accident, but is challenging the cause, nature, and extent

of Dr. Bostick's losses, injuries, or damages." (Doc. # 141 at 7).

This instruction is clear, concise, direct, and is not misleading. It was what Bostick requested. During the October 26, 2017, charge conference, the Court considered defining negligence in the jury instructions, but Bostick opposed elaborating on the issue of negligence or defining negligence. The Court notes that State Farm's proposed jury instructions (Doc. # 85 at 16) contained a discussion of negligence and the legal definition of negligence, but the Court omitted that instruction based on Bostick's arguments. Now, in hindsight, Bostick regrets her arguments. It is too late, and the Court determines that the instructions given were an accurate account of the law and do not warrant a new trial.

### E.    **Bostick's Treating Physicians**

Bostick complains that the Court unfairly limited some of her treating physicians from testifying regarding causation. However, and as explained in detail in the Court's prior ruling (Doc. # 74), the Court limited the testimony of some of Bostick's physicians because Bostick violated the Federal Rules of Civil Procedure. She did not

timely and properly disclose her treating physicians if she desired for them to serve as expert witnesses. Plainly, Bostick violated Federal Rule of Civil Procedure 26(a)(2)(C). As a consequence, the Court allowed certain treating physicians to testify, but limited the testimony to observations made during Bostick's treatment. (Doc. # 74). This is not grounds for a new trial.

### F. Improper Defense Arguments

Bostick also asserts that defense counsel made "improper arguments" such that a new trial is warranted. Without specifying exactly what improper arguments were made, Bostick insinuates that defense counsel improperly argued to the jury that Bostick was mentally ill. The Court gives this assertion short shrift. More than one witness offered testimony concerning Bostick's mental state. Her own husband testified about Bostick's suicide attempt and her child testified that she was on antidepressant "Rob pills" because of her son Robert's same-sex preference. Bostick's mental illness was not a fabrication of the defense team. Counsel for State Farm made arguments based on the evidence in the record, and there was nothing

improper about the manner in which counsel defended State Farm in this action.

### G.  **Dr. Fijalowski**

State Farm retained Dr. Fijalkowski, a biomechanical and biomedical engineer, as an expert witness and properly disclosed his identity to Bostick on March 10, 2017. (Doc. # 60 at 1). Dr. Fijalkowski was retained to assist the jury in understanding the mechanics and biomechanics of the car accident, including the forces involved, levels of force reasonably necessary to result in certain injuries, and the likelihood of injury to Bostick.

Bostick filed a Motion in Liminie arguing that Dr. Fijalkowski's methodology is flawed because Dr. Fijalkowski failed to take into consideration Bostick's idiosyncratic features, among other arguments. (Doc. # 60).  The Court denied the Motion to Strike. (Doc. # 76).  Bostick now claims that a new trial is warranted because: "Despite his lack of qualifications and specialization, Dr. Fijalkowski testified that the forces experienced by Plaintiff in the auto accident were insufficient to cause any of the injuries she suffered. Permitting this witness to offer testimony that the forces experienced by Plaintiff were insufficient

to cause her injury was in error because that testimony speaks directly to medical causation, an opinion the witness is not qualified to render." (Doc. # 163 at 8).

But, it is well-established in the case law that biomechanical engineers - like Dr. Fijalkowski - "are qualified to testify about how forces may affect or injure an individual." Berner v. Carnival Corp., 632 F. Supp. 2d 1208, 1213 (S.D. Fla. 2009). Interestingly, Dr. Fijalkowski stated his agreement with Bostick that medical and biomechanical engineering causation are two distinct concepts and that he knew that his role was to determine whether or not Bostick's injuries were related to the accident based on his biomedical and biomechanical analysis. (Doc. # 165-3 at 72-75). Dr. Fijalkowski's analysis was consistent with the Court's prior ruling in the context of a Daubert order. He did not cross the line into giving medical causation testimony, and a new trial is not warranted based on any aspect of Dr. Fijalkowski's testimony.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Plaintiff Lisa N. Bostick's Motion for New Trial (Doc.
# 163) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida this
<u>20th</u> day of March, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE